NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY CURTIS, | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | **AMENDED OPINION** |
| v. | Civil Action No. 05-2807 (DMC) |
| BESAM GROUP, BESAM AUTOMATED ENTRANCE SYSTEMS, INC., BESAM USA, B.E.A. INC., THE HALMA GROUP, INC., ABC CORP. 1-20 (fictitious entities), DEF CORP. 1-10 (fictitious entities), JOHN AND JANE DOES 1-30, | |
| Defendants. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by B.E.A., Inc. ("BEA"), the Halma Group, Inc. ("Halma") and Besam Automated Entrance Systems, Inc. ("Besam," and collectively "Defendants") for summary judgment. Pursuant to FED. R. CIV. P. 78, no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendants' motion for summary judgment is **granted**.

**I.   BACKGROUND**

Plaintiff, Mary Curtis, was employed as an emergency room ("ER") technician at Bayonne Medical Center ("BMC"). Plaintiff claims that on March 25, 2004, she was pushing the back of a stretcher and aligning it to enter the Intensive Care Unit ("ICU") when she swung her

end of the stretcher into the Operating Room ("OR") entry door alcove immediately across the hall from the ICU doors. Registered Nurse Lori Lopez was allegedly guiding the front of the stretcher. When Plaintiff entered the OR entry door alcove, her right hip was closest to the door on her right. Plaintiff claims that she was there approximately three to five seconds from the time she entered the OR entry alcove when the door closest to her right hip slammed into her hip. Plaintiff claims she was standing one to two feet within the OR entry door alcove.

As a result of the incident, Plaintiff sustained back injuries and eventually had back surgery. Plaintiff was on "medical leave" from her job at BMC for one year, returning to work on or about March 26, 2005. Lopez, the independent witness to the incident, stated in her deposition that she did not recollect Plaintiff being hit by the OR doors. Lopez only recalled Plaintiff saying that she was hit at some point, but she is unclear whether it was immediately after the incident or later when they returned to the ER. Lopez recalls continuing on to wheel the stretcher and patient into the ICU. Lopez does not recall any jarring, noise or exclamation by Plaintiff or noise or awkward action by the OR doors. Lopez recalls that Plaintiff brought the stretcher back into the ER after they transported the patient to the ICU.

Plaintiff's accident allegedly occurred on March 25, 2004, however, the automatic door system and the BEA sensors continued to operate without repair or service until May 17, 2005. Thomas Martiak, a Supervisor at BMC, stated in his deposition that he was never called to the scene to examine any other doors on any other occasion. Plaintiff claims that she filled-out an incident report and noted a conversation with Martiak regarding the doors acting as if they had no sensors. Martiak recalls no such conversation, nor does he recall telling anyone that there should

2

be a safety device on the OR entry doors.

Plaintiff claims that there was another incident days after she returned to work on March 27, 2005, wherein the OR entry doors closed on the stretcher on which she was moving. Plaintiff claims that Registered Nurse Ellen Visone witnessed the incident on March 27, 2005. Although Visone recalls the incident, she disputes whether it was the OR entry doors that closed on the stretcher. The sensors, however, operated properly from March 25, 2004 until May 17, 2005 – some fourteen months later.

BESAM designed, installed, serviced and maintained the OR automatic entry door system. On or about May 17, 2005, Ryan Diehl, a BESAM technician, was dispatched to BMC because the OR entry doors failed to close. Diehl determined that one of the DK-12 presence sensors was faulty, preventing it from detecting if anything was in the door's swing path. Diehl, however, never read the DK-12 manual and does not know specifically how DK-12 sensors work. Diehl admitted that, on the date he replaced the DK-12 sensors, he was unaware whether there was an easier way to correct the problem with the sensors other than removing them. Diehl does not recall which of the two DK-12s LED light was not on and did not try to fix the sensor because he "had no way of knowing how to fix it." Diehl did not know how to determine what, if anything, was wrong with one DK-12, so he replaced both of them.

In Plaintiff's expert, Wayne F. Nolte, Ph.D., P.E.'s Engineering Report, he discussed the OR doors.[1] The OR entry doors were installed in 1998 as part of a BMC remodel project. The

---

[1] All of the technical information concerning the doors and sensors discussed in this Opinion are found in Wayne F. Nolte, Ph.D., P.E.'s Engineering Report, dated April 19, 2006.

3

OR automatic entry door system included two BESAM Swingmaster 455a operators, two DK-12 presence sensors, a LO-21 lock-out relay and two push-plates. Defendants manufacture, *inter alia*, automatic door safety sensors, including DK-12s and LO-21s. Defendants were not involved in the design, installation, service or maintenance of the OR automatic entry door system. DK-12s are presence sensors, such that when they detect something in the swing path of the door, they prevent the door from opening if the door is closed and will not allow the door to close if open. The LO-21 is a lock-out device, which allows the doors to be reactivated before completion of either the closing or opening cycle when the push plate is activated. The OR entry doors also operate manually by using a handle to pull open, as a normal, non-automated door. The OR entry doors are activated to open under power by pressing a push plate. Activating a power door by way of a push plate is known as a "knowing act" activation. The sensors were disregarded. Neither party retained the sensors. Therefore, Nolte was unable to test the sensors.

      The OR entry door push plates are located in the BMC hallway and inside the OR doors so that they can be activated from either side. The OR entry doors do not close under power, but rather against a spring. The DK-12 sensors have a number of different options for settings such as relay hold time, sensitivity, which must be set upon installation and were set by BESAM in this case. Nolte did not determine how many different settings there are on the DK-12.  Although it is critical that the DK-12 sensor in question was unavailable for Nolte's inspection, he admitted that he did not make any inquiry or otherwise attempt to determine the lot number of the allegedly defective sensor, nor did he attempt to compare other DK-12 sensors within the hospital to determine if there were manufacturing defects. Nolte failed to conduct this

4

investigation despite his concession that, if a product has a manufacturing defect, an inquiry should be made regarding other products from the same lot to determine if they share the same manufacturing defect.

## II.   STANDARD OF REVIEW: FED. R. CIV. P. 56 SUMMARY JUDGMENT

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  The moving party bears the burden of showing that there is no genuine issue of fact. See id.  "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  However, "[i]n determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J.

2000) aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

### III.  DISCUSSION

Plaintiff's First Count alleges product defects, which are unsupported by admissible opinion testimony from her own expert and there are no credible and genuine independent facts to support those claims. Similarly, Plaintiff's Second Count alleges negligence against Defendants, which lacks legal basis because Defendants only manufacture the sensors and the claims are subsumed by New Jersey's Product Liability Act. See N.J.S.A. 2A:58C-2. Finally, Plaintiff is not legally entitled to an indeterminate product defect inference. Without expert testimony and an inference of indeterminate product defect, Plaintiff cannot sustain her claims against Defendants' summary judgment challenge. Thus, Defendants' motion for summary judgment is **granted**.

Plaintiff's First Count, which alleges product defect claims against Defendants, must be dismissed on summary judgment. Plaintiff claims that Defendants manufactured a defective product under two theories of liability: (1) Defendants defectively manufactured the sensors; and (2) Defendants failed to warn foreseeable users that their sensor has an alleged six year "shelf-life," which Plaintiff claims is a dangerous condition. Defendants assert that Plaintiff has no credible factual or expert testimony or opinion supporting her theories against Defendants and Plaintiff is not entitled to an inference to fill-in the gaps in the proofs.

Plaintiff cannot prove manufacturing defects as a matter of law. To succeed under New Jersey's Product Liability Act on a manufacturing defect claim, a plaintiff must prove that the

6

product was not manufactured according to its design specifications. A manufacturing defect is a "deviation from the design specification, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae." See Myrlak v. Port Authority, 157 N.J. 84, 97 (1999). New Jersey has also adopted the Restatement (Third) of Torts: Product Liability, which defines a manufacturing defect as a departure from the product's intended design, despite the manufacturer's use of all possible care in preparing and marketing the product. Plaintiff must show that the particular DK-12 sensors in question "came off of the production line in a substandard condition." See Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 576 (App. Div. 1986). Here, Plaintiff has failed to elicit any factual or expert testimony which would suggest that the particular lot of DK-12 sensors was flawed in production or did not otherwise operate properly as alleged in Plaintiff's Complaint.

Plaintiff cannot sustain its "failure to warn" claims without admissible expert testimony. Plaintiff claims that the sensors had a six year "shelf-life" because one of the sensors allegedly failed after six years when the OR entry doors allegedly hit Plaintiff. Plaintiff alleges that this "shelf-life" is a dangerous condition and that Defendants had a duty to warn foreseeable users of the condition. Plaintiff alleges that Defendants' failure to warn her of an alleged "shelf-life" was the proximate cause of her accident.

A New Jersey Plaintiff bringing a claim for failure to warn has the burden of proving that the manufacturer did not warn of the risks attendant to the product and that the failure to warn was a proximate cause of Plaintiff's injuries. See Sharpe v. Bestop, Inc., 713 A.2d 1079, 1083 (N.J. Super. Ct. App. Div. 1998). Here, Plaintiff fails to demonstrate that the DK-12

sensors had a "defective and dangerous condition" that represents a risk attendant to the product. For example, Plaintiff failed to address the fact that, after the accident, the sensors operated properly without incident until May 2005 – some fourteen months after the initial incident. In fact, Plaintiff's expert concedes that the BESAM technician who came to service the doors found that only one of the sensor's LED lights was out. He also concedes that the technician had no training in servicing the sensors, no knowledge as to how the sensor worked, no idea whether the sensor was actually broken or had a defect and could not even remember which sensor's light was out. The technician removed both sensors and replaced them because he was unable to determine if there was a problem with them. Furthermore, Plaintiff fails to offer any evidence that any DK-12's "shelf-life" is actually six years. Therefore, Plaintiff fails to show that there was a dangerous condition. Plaintiff also fails to propose a warning that would adequately apprise users of the inherent risk associated with automatic doors, but for the one already in place on the date of the accident. Finally, Plaintiff fails to address the fact that "no product is intended to last indefinitely and many products require care and maintenance to perform at the same level as they did new." H.T. Rose Enters., Inc. v. Henney Penny Corp., 317 N.J. Super. 490 (App. Div. 1998). Plaintiff fails to prove a "shelf-life" defect in the DK-12 product, propose a warning which would allegedly have apprised her of the risk or show that any failure to warn was the proximate cause of her injury, so her "failure to warn" claims against Defendants fail as a matter of law.

  Summary judgment must be granted on all of Plaintiff's claims against Defendants. A party's case must be dismissed on summary judgment if the party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that

party bears the ultimate burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Further, the mere existence of some alleged factual dispute between the parties is an insufficient basis upon which to deny a motion for summary judgment. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). There must remain a genuine issue of material fact. The Supreme Court of the United States determined that a fact is "material" if it will affect the outcome of a lawsuit under the applicable law and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact-finder could return a verdict for a nonmoving party. Id.

Here, because Plaintiff's product defect claims against Defendants rely upon her expert's purported opinions and those opinions are mere hypotheses which are inadmissable as a matter of law, Plaintiff cannot sustain her claims. As Nolte concedes, he does not know what the alleged manufacturing defect is, or even whether one exists and he concedes that he does not know if DK-12s have a six year "shelf-life."

Despite Nolte's assertion that it might have been one of the myriad of electrical components within the DK-12 sensors that failed, he conceded that they would not fix themselves such that the door would operate again for fourteen months, but rather the component would be in need of repair. Nolte admitted that if one product in a lot has a manufacturing defect, one should examine the other products in the lot to determine if they share the same defect. Nolte conceded, however, that he failed to inquire or otherwise attempt to determine what the lot number of the allegedly defective sensor was or to compare it to other DK-12 sensors within the hospital to determine if they also contained manufacturing defects.

Nolte testified that Defendants' DK-12 sensors have a six year "shelf-life" and this is a dangerous condition and a defect against which Defendants failed to warn. Nolte's opinions, however, are again rife with speculation and unquantified possibilities. Specifically, Nolte testified at deposition that he does not know if DK-12s have a six year "shelf-life." Nolte concedes that he is unaware of any other DK-12s that have failed after six years and he bases his opinion that the DK-12s have such a "shelf-life" on the single sensor that controlled the door that allegedly struck Plaintiff.

Plaintiff's expert concedes that he did not ask Plaintiff's counsel to request any manufacturer testing information for the "shelf-life" of the sensor or that such information would be essential to his analysis and opinion in this case. Plaintiff's expert read no literature regarding a DK-12's purported "shelf-life." Plaintiff's expert concedes that he did not do any research to determine when DK-12s have failed in the past. He did not search any of his periodicals or any other expert websites to determine whether automatic door sensors have "shelf-lives." In fact, Nolte conceded that his opinion regarding the DK-12 sensors' "shelf-life" is based solely upon his examination in this case.

    A.    <u>Analysis Under Daubert</u>

Under <u>Daubert</u>, Nolte's opinions are scientifically unreliable and, therefore, must be barred. The decision to admit expert testimony rests within the sound discretion of the trial judge. <u>See</u> <u>Muise v. G.P.U., Inc.</u>, 851 A.2d 799, 826 (N.J. Super. Ct. App. Div. 2004). The trial judge acts as a gatekeeper to insure that all expert testimony is both relevant and reliable. <u>See</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993). FED. R. EVID. 702, which governs the

10

admissibility of expert testimony in Federal Court, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The admissibility decision focuses on the expert's methodology, reasoning, foundation of documents and data. Judgments regarding credibility and weight arise only after admissability has been determined. See Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997). In Daubert, the Supreme Court articulated factors for courts to consider in determining whether to admit expert testimony: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship between the technique to methods which have been established to be reliable; (7) the testifying expert witness's qualifications; and (8) the nonjudicial uses to which the method has been put. See In re Paoli R.R. Yard Pcb Litig., 35 F.3d 717, 742 (3d Cir. 1994). Daubert applies not only to scientific knowledge, but also to testimony based on technical and other specialized knowledge. See Kumbo Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

In the current case, Nolte failed to base his opinion on salient facts and data because they are not the result of applying reliable engineering principles and methods. Nolte arguably sets-out testable hypotheses regarding the manufacturing defect, which he claims may have resulted from one of the sensor's electronic components failing. Similarly, he opines that DK-12 sensors have a six

11

year "shelf-life." Nolte similarly failed to provide the appropriate methodology or sound engineering basis for his conclusions. Although the DK-12 sensor in question was unavailable for inspection, Nolte admitted that he did not make any inquiry or otherwise attempt to determine the lot number of the allegedly defective sensor to compare it to other DK-12 sensors within the hospital to see if they also contained manufacturing defects. The Court recognizes that the DK-12 sensor in question was unavailable for Nolte's inspection, but Nolte failed to investigate the lot despite his concession that, if a product has a manufacturing defect, an inquiry should be made regarding other products from the same lot to determine if they share the same manufacturing defect. Thus, because Nolte failed to use any methodology, testable hypothesis or standards upon which to base his findings, both Daubert and FED. R. EVID. 702 preclude their admission. Nolte's opinions provide no assistance to a jury, so they are inadmissable under Daubert and Plaintiff cannot rely upon them in support of her claim against Defendants.

  B. Net Opinion

Nolte's testimony is inadmissible as a matter of law because it is net opinion and cannot withstand a Daubert analysis. On April 19, 2006 and September 21, 2006, Nolte issued written expert reports in this case. Nolte was deposed on May 17, 2007, at which time he opined that Defendant's DK-12 sensors were defective and were a cause of Plaintiff's injuries because Defendant's DK-12 sensors contained manufacturing defects and had a dangerous or defective condition, namely a six year "shelf-life" of which Defendant failed to warn. Nolte's opinions, however, are net opinions and are inadmissable under Daubert.

12

Nolte's opinions are based on speculation, possibilities or contingencies instead of fact and analysis and are, thus, inadmissable net opinions. It is well-settled among New Jersey courts that, in order for an expert opinion to be admissible at trial, it must be based upon factual evidence and not pure speculation, possibilities or contingencies. See Buckelew v. Grossbard, 87 N.J. 512 (1981); Dawson v. Bunker Hill Plaza Assocs., 289 N.J. Super. 309 (App. Div. 1996); Jiminez v. GNOC Corp., 286 N.J. Super. 533 (App. Div. 1996). Expert opinion testimony is intended to assist the trier-of-fact in making factual determinations in areas that are normally outside the sphere of general common knowledge and beyond the average juror's understanding. See State v. Kelly, 97 N.J. 178, 209 (1984). For this reason, courts must exclude an expert's testimony that constitutes nothing more than a "net opinion"– an opinion that is based merely on unfounded speculation and unquantified possibilities. See Dawson v. Bunker Hill Assoc., 289 N.J. Super. 309 (App. Div. 1996). This rule is merely a restatement of the well-settled principle that an expert's bare conclusions, unsupported by factual evidence, are inadmissable. See Buckelew, 87 N.J. at 12. The net opinion rule requires the expert to give the "why and wherefore" of the opinion, rather than a mere conclusion. See Rosenberg v. Tavorath, M.D., 352 N.J. Super 385 (App. Div. 2002). Expert testimony, therefore, is unpermitted if it appears that the witness is unable to articulate a reasonably accurate conclusion, as distinguished from a mere guess or conjecture. See Vuocolo v. Diamond Shemrock Chem. Co., 240 N.J. Super. 289, 299 (App. Div. 1990). An expert who offers an opinion without providing specific underlying reasons for the conclusions "ceases to be an aid to the trier of fact and becomes nothing more than an additional juror." Jimenez, 286 N.J. Super. at 540.

Nolte's opinions regarding the manufacturing defect are based upon pure conjecture and hypothesis. Specifically, Nolte did not test the sensors that he claims were defective and were discarded due to either Plaintiff or BESAM's failures to preserve the sensors. Nolte failed to request an exemplar sensor and inspect other DK-12 sensors from the same installation at the hospital to determine if there was a manufacturing problem with the lot. Nolte did not determine which specific component failed within the DK-12, but failed temporarily then fixing itself and working again without incident for another fourteen months. Finally, Nolte failed to conduct any independent research. Conversely, Nolte testified to his total lack of knowledge regarding the actual manufacturing defect. Moreover, Nolte concedes that he is unqualified to offer a professional opinion regarding the electrical components' capability of malfunctioning, but rather would require an electrical engineer to decipher this information.

      C.     *Res Ipsa Loquitur*

Plaintiff is not entitled to a *res ipsa loquitur* inference against Defendants, nor is she entitled to receive an inference of product defect under the "indeterminate product defect test." Where no direct evidence exists regarding Defendants' negligence, the doctrine of *res ipsa loquitur* allows, *via* circumstantial evidence, an inference that the harm sustained by the plaintiff was caused by the defendant's negligence. In Myrlak v. Port Auth. of N.Y. and N.J., however, the New Jersey Supreme Court specifically stated that the doctrine of *res ipsa loquitur* is inapplicable to a product defect case brought by a plaintiff against a manufacturer. See 157 N.J. 84, 95 (1999). Instead, the Court

14

determined that a plaintiff may enjoy a similar inference only when the requirements set-forth in the Restatement (Third) of Torts § 3 (1998) are met:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
> (A) was of a kind that ordinarily occurs as a result of a product defect; AND
> (B) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Restatement (Third) of Torts § 3 (1998); Myrlak, 157 N.J. at 95; Brown v. Raquet Club of Bricktown, 95 N.J. 280, 288-92 (1984).

Here, Plaintiff asserts that the OR entry door nearest her suddenly closed, striking her hip. Common experience does not provide that this alleged incident would not have occurred in the absence of a product defect in the detection sensors mounted on the doors, namely the DK-12s manufactured by Defendants. Specifically, Nolte conceded that when the sensors are properly operating and the door has entered its closing cycle, the DK-12 sensors are not in detection and a person entering the swing path of the door could be hit by the door. Because this is how the DK-12s normally operate, a claim for being hit by the door does not constitute an event that would ordinarily suggest a defect in the door sensors.

### IV.   CONCLUSION

For the reasons stated, it is the finding of this Court that Defendants' motion for summary judgment is **granted**. An appropriate Order accompanies this Opinion.

S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:      October    31   , 2007
Orig.:     Clerk
cc:        All Counsel of Record
           Hon. Mark Falk, U.S.M.J.
           File