NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| MARY CURTIS, | : | **Hon. Dennis M. Cavanaugh** |
|  | : |  |
| Plaintiff, | : | **OPINION** |
|  | : |  |
| v. | : | Civil Action No. 05-CV-2807 (DMC) |
|  | : |  |
| BESAM GROUP, BESAM | : |  |
| AUTOMATED ENTRANCE SYSTEMS, | : |  |
| INC., BESAM USA, B.E.A. INC., THE | : |  |
| HALMA GROUP, INC., ABC CORP. 1- | : |  |
| 20 (fictitious entities), DEF CORP. 1-10 | : |  |
| (fictitious entities), JOHN AND JANE | : |  |
| DOES 1-30, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

This matter comes before the Court upon motion by Plaintiff Mary Curtis ("Plaintiff") for reconsideration of this Court's Amended Opinion and Orders, dated October 31, 2007; and Defendant Besam Automated Entrance Systems, Inc.'s ("Besam") motion for partial summary judgment. Besam moved for partial summary judgment, joining in Defendants B.E.A., Inc. ("BEA") and the Halma Group, Inc.'s ("Halma," collectively, "Defendants") motion for summary judgment. After carefully considering the submissions of the parties and hearing oral argument regarding the motion for reconsideration on December 19, 2007, and based upon the following, it is the finding of this Court that Plaintiff's motion for reconsideration is **granted** in part and **denied** in part; and Besam's motion for partial summary judgment is **denied**.

I.  **BACKGROUND**[1]

Plaintiff was employed as an emergency room ("ER") technician at Bayonne Medical Center ("BMC"). Plaintiff alleges that on March 25, 2004, she was pushing a stretcher and aligning it to enter the Intensive Care Unit ("ICU") when she swung her end of the stretcher into the Operating Room ("OR") entry door alcove immediately across the hall from the ICU doors. Registered Nurse Lori Lopez was allegedly guiding the front of the stretcher. When Plaintiff entered the OR entry door alcove, her right hip was closest to the door on her right. Plaintiff claims that she was there approximately three to five seconds from the time she entered the OR entry alcove when the door closest to her right hip slammed into her hip (the "Accident"). Plaintiff claims that she was standing within one to two feet from the OR entry door alcove. As a result of the alleged incident, Plaintiff sustained back injuries and eventually underwent back surgery.[2] Plaintiff was on "medical leave" from her job at BMC for one year and she returned to work on or about March 26, 2005.

---

[1] The facts set-forth in this Opinion are taken from the Parties' FED. R. CIV. P. 56.1 statements in their respective moving papers. The facts reflect that "[i]n determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

[2] While the Court accepts Plaintiff's testimony as true for purposes of this motion, it should be noted for the record that Lopez, the independent witness to the incident, stated in her deposition that she did not recollect Plaintiff being hit by the OR doors. Lopez only recalled Plaintiff saying that she was hit at some point, but Lopez is unclear whether it was immediately after the incident or later when they returned to the ER. Lopez recalls continuing on to wheel the stretcher and patient into the ICU. Lopez does not recall any jarring, noise or exclamation by Plaintiff or noise or awkward action by the OR doors. Lopez recalls that Plaintiff brought the stretcher back into the ER after they transported the patient to the ICU.

The Accident allegedly occurred on March 25, 2004. Notwithstanding Plaintiff's testimony that, in March 2005, she saw the door almost close on a patient, the automatic door system and the BEA sensors continued to operate without repair or service until May 17, 2005. Thomas Martiak, a Supervisor at BMC, stated in his deposition that he was never called to the scene to examine any other doors on any other occasion. Plaintiff claims that she completed an incident report and noted a conversation with Martiak regarding the doors acting as if they had no sensors. Martiak, however, recalls no such conversation, nor does he recall telling anyone that there should be a safety device on the OR entry doors.

Plaintiff claims that there was another incident days after she returned to work on March 27, 2005, wherein the OR entry doors closed on the stretcher on which she was moving. Plaintiff claims that Registered Nurse Ellen Visone witnessed the incident on March 27, 2005. Although Visone recalls the incident, she disputes whether the OR entry doors closed on the stretcher.

Besam designed, installed, serviced and maintained the OR automatic entry door system. On or about May 17, 2005, Ryan Diehl, a Besam technician, was dispatched to BMC because the OR entry doors failed to close. Diehl determined that one of the DK-12[3] presence sensors was faulty, preventing it from detecting if anything was in the door's swing path. Diehl, however, never read the DK-12 manual and does not know specifically how DK-12 sensors operate. Diehl admitted that, on the date he replaced the DK-12 sensors, he was unaware whether there was an easier way to correct the problem with the sensors other than removing them. Diehl did not attempt to fix

---

[3] DK-12s are presence sensors, such that when they detect something in the swing path of the door, they prevent the door from opening if the door is closed and will not allow the door to close if open.

the sensor because he "had no way of knowing how to fix it." Diehl did not know how to

determine what, if anything, was wrong with either DK-12, so he replaced both DK-12s.

Plaintiff's expert, Wayne F. Nolte, Ph.D., P.E., discussed the OR doors in his Engineering

Report.[4] The OR entry doors were installed in 1998 as part of a BMC remodel project. The OR

automatic entry door system included two Besam Swingmaster 455a operators, two DK-12

presence sensors, a LO-21[5] lock-out relay and two push-plates. BEA and Halma manufacture,

*inter alia*, automatic door safety sensors, including DK-12s and LO-21s. BEA and Halma,

however, were not involved in the design, installation, service or maintenance of the OR

automatic entry door system. The OR entry doors also operate manually by using a handle to pull

open, as a normal, non-automated door. The OR entry doors are activated to open under power

by pressing a push plate. Activating a power door by way of a push plate is known as a "knowing

act" activation. Plaintiff was never in custody, control or possession of the sensors, but

nonetheless no party took any action to retain the sensors. Instead, Besam discarded the sensors.

Therefore, Nolte was unable to test the sensors in question and apparently chose not to test or

examine similar sensors.

The OR entry door push plates are located in the BMC hallway and inside the OR doors

so that they can be activated from either side. The OR entry doors do not close under power, but

---

[4] All of the technical information concerning the doors and sensors discussed in this Opinion are found in
Wayne F. Nolte, Ph.D., P.E.'s Engineering Report, dated April 19, 2006.

[5] The LO-21 is a lock-out device, which allows the doors to be reactivated before completion of the closing
cycle when the push plate is activated. It merely allows the doors to be reactivated before completion of the closing
cycle.  Aug. 15, 2006 deposition of BEA's Jeff Dunham at 52:6-53:12.

rather against a spring. The DK-12 sensors have a number of different settings options, such as relay hold time and sensitivity, which must be set upon installation and were set by Besam in this case. Nolte did not determine how many different settings there are on the DK-12.  Although it is critical that the DK-12 in question was unavailable for Nolte's inspection, he admitted that he did not make any inquiry or otherwise attempt to determine the allegedly defective sensor's lot number, nor did he attempt to compare other DK-12s within the hospital to determine if there were manufacturing defects. Nolte failed to conduct this investigation despite his concession that, if a product has a manufacturing defect, an inquiry should be made regarding other products from the same lot to determine if they share the same manufacturing defect.

## II.    STANDARD OF REVIEW

### A.     L. CIV. P. 7.1(g): Motion for Reconsideration

Motions for reconsideration are governed by L. CIV. R. 7.1(i).  See United States v. Compaction Sys. Corp., 88 F. Supp. 2d 339, 345 (D.N.J. 1999).  A motion pursuant to L. CIV. R. 7.1(i) may be granted only if (1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. See Database Am., Inc. v. Bellsouth Adver. & Pub. Corp., 825 F. Supp. 1216, 1220 (D.N.J. 1993).  Such relief is "an extraordinary remedy" that is to be granted "very sparingly." See NL Indus. Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996). Reconsideration is inappropriate where the motion merely raises a party's disagreement with the Court's decision or seeks to rehash arguments already raised and rejected. See Russell v. Levi, 2006 WL 2355476 *1-2 (D.N.J. Aug. 15, 2006); Oritani S&L v. Fidelity &

Deposit, 744 F. Supp. 1311, 1314 (D.N.J. 1990); Florham Park Chevron, Inc. v. Chevron U.S.A.,

Inc., 680 F. Supp. 159, 163 (D.N.J. 1988).

      B.     FED. R. CIV. P. 56: Summary Judgment

      Summary judgment is granted only if all probative materials of record, viewed with all

inferences in favor of the non-moving party, demonstrate that there is no genuine issue of

material fact and that the movant is entitled to judgment as a matter of law.  See FED. R. CIV. P.

56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  The moving party bears the burden of

showing that there is no genuine issue of fact.  See id.  "The burden has two distinct components:

an initial burden of production, which shifts to the nonmoving party if satisfied by the moving

party; and an ultimate burden of persuasion, which always remains on the moving party."  Id.

The non-moving party "may not rest upon the mere allegations or denials of his pleading" to

satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor.

See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986).  "[U]nsupported allegations in [a] memorandum and pleadings are insufficient

to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir.

1990).  "In determining whether there are any issues of material fact, the Court must resolve all

doubts as to the existence of a material fact against the moving party and draw all reasonable

inferences - including issues of credibility - in favor of the nonmoving party."  Newsome v.

Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd,

51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

6

**III.**   **DISCUSSION**

      A.   Motion for Reconsideration

This Court finds that Plaintiff has met its burden in demonstrating that significant facts exist warranting reconsideration of this Court's Opinion with respect to Besam.  As such, this Court grants Plaintiff's motion for reconsideration with respect to Besam, but denies reconsideration of this matter as it relates to BEA and Halma.

      B.   Motion for Summary Judgment

Besam argues that, because summary judgment has been granted in favor of BEA and Halma, the law of the case doctrine applies and, therefore, Plaintiff is precluded from relitigating these factual issues at trial. Moreover, Besam asserts that Plaintiff's expert should be excluded for failing to meet the standard required by Daubert v. Merrell Dow Pharms., Inc. and the net opinion rule.  See 509 U.S. 579 (1993).  Besam's representative, however, destroyed the DK-12 sensors, an act that arguably constitutes negligent spoliation of evidence.  Therefore, this Court finds that Plaintiff is entitled to an inference of product defect because Plaintiff cannot inspect the sensors in question to determine if they were defective.  As such, a genuine issue of material fact exists, thereby precluding summary judgment.

      1.   Plaintiff's Expert is Precluded from Testifying

Plaintiff's expert's opinions are mere hypotheses and inadmissable as a matter of law under both Daubert and the net opinion rule.  See id.  Despite Nolte's assertion that it might have been one of the myriad of electrical components within the DK-12 sensors that failed, he conceded that the sensors would not fix themselves such that the door would operate again for

fourteen months, but rather the component would be in need of repair. Nolte admitted that if one product in a lot has a manufacturing defect, one should examine the other products in the lot to determine if they share that defect. Nolte conceded, however, that he failed to inquire or otherwise attempt to determine what the lot number of the allegedly defective sensor was or to compare it to other DK-12 sensors within the hospital to determine if they also contained manufacturing defects.

Nolte testified that BEA and Halma's DK-12 sensors have a six-year "shelf-life" and this is a dangerous condition and a defect against which BEA and Halma failed to warn. Nolte's opinions, however, are again rife with speculation and unquantified possibilities. Specifically, Nolte testified at deposition that he does not know if DK-12s have a six-year "shelf-life." Nolte concedes that he is unaware of any other DK-12s that have failed after six years and he bases his opinion that the DK-12s have such a "shelf-life" on the single sensor that controlled the door which allegedly struck Plaintiff.

Nolte concedes that he did not ask Plaintiff's counsel to request any manufacturer testing information for the sensors' "shelf-life" or that such information would be essential to his analysis and opinion in this case. Nolte failed to read any literature regarding a DK-12's purported "shelf-life." Nolte concedes that he did not do any research to determine when DK-12s have failed in the past. He did not search any of his periodicals or any other expert websites to determine whether automatic door sensors have "shelf-lives." In fact, Nolte conceded that his opinion regarding the DK-12 sensors' "shelf-life" is based solely upon his examination – or lack thereof – in this case.

i.     Analysis Under Daubert

Under Daubert, Nolte's opinions are scientifically unreliable and, therefore, must be barred. The decision to admit expert testimony rests within the sound discretion of the trial judge. See Muise v. G.P.U., Inc., 851 A.2d 799, 826 (N.J. Super. Ct. App. Div. 2004). The trial judge acts as a gatekeeper to insure that all expert testimony is both relevant and reliable. See Daubert, 509 U.S. at 589. FED. R. EVID. 702, which governs the admissibility of expert testimony in Federal Court, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The admissibility decision focuses on the expert's methodology, reasoning, foundation of documents and data. Judgments regarding credibility and weight arise only after admissability has been determined. See Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997). In Daubert, the Supreme Court of the United States articulated factors for courts to consider in determining whether to admit expert testimony: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship between the technique to methods which have been established to be reliable; (7) the testifying expert witness's qualifications; and (8) the nonjudicial uses to which the method has been utilized. See In re Paoli R.R. Yard Pcb Litig., 35

9

F.3d 717, 742 (3d Cir. 1994). <u>Daubert</u> applies not only to scientific knowledge, but also testimony based on technical and other specialized knowledge. <u>See</u> <u>Kumbo Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999).

 In the current case, Nolte failed to base his opinion on salient facts and data.  The opinions are not the result of applying reliable engineering principles and methods. Nolte arguably sets-out testable hypotheses regarding the manufacturing defect, which he claims may have resulted from one of the sensor's electronic components failing. Similarly, he opines that DK-12 sensors have a six year "shelf-life." Nolte similarly failed to provide the appropriate methodology or sound engineering basis for his conclusions. Although the DK-12 in question was unavailable for inspection, Nolte admittedly failed to make any inquiry or otherwise attempt to determine the lot number of the allegedly defective sensor to compare it to other DK-12 sensors within the hospital to see if they also contained manufacturing defects. The Court recognizes that the DK-12 sensor in question was unavailable for Nolte's inspection, but Nolte failed to investigate the lot despite his concession that, if a product has a manufacturing defect, an inquiry should be made regarding other products from the same lot to determine if they share the same manufacturing defect. Thus, because Nolte failed to use any methodology, testable hypothesis or standards upon which to base his findings, both <u>Daubert</u> and FED. R. EVID. 702 preclude their admission. Nolte's opinions provide no assistance to a jury, so they are inadmissable under <u>Daubert</u> and Plaintiff cannot rely upon them in support of her claim against Defendants.

    ii. <u>Net Opinion</u>

  Nolte's testimony is inadmissable as a matter of law because it is net opinion and cannot withstand a <u>Daubert</u> analysis. On April 19, 2006 and September 21, 2006, Nolte issued written expert reports in this case. Nolte was deposed on May 17, 2007, at which time he opined that Defendant's DK-12 sensors were defective and were a cause of Plaintiff's injuries because Defendant's DK-12 sensors contained manufacturing defects and had a dangerous or defective condition, namely a six-year "shelf-life" of which Defendant failed to warn. Nolte's opinions, however, are net opinions and are inadmissable under <u>Daubert</u> and the Federal Rules.

  Nolte's opinions are based on speculation, possibilities or contingencies instead of fact and analysis and are, thus, inadmissable net opinions. It is well-settled among New Jersey courts that, in order for an expert opinion to be admissible at trial, the opinion must be based upon factual evidence and not pure speculation, possibilities or contingencies. <u>See</u> <u>Buckelew v. Grossbard</u>, 87 N.J. 512 (1981);   <u>Dawson v. Bunker Hill Plaza Assocs.</u>, 289 N.J. Super. 309 (App. Div. 1996); <u>Jiminez v. GNOC Corp.</u>, 286 N.J. Super. 533 (App. Div. 1996). Expert opinion testimony is intended to assist the trier-of-fact in making factual determinations in areas that are normally outside the sphere of general common knowledge and beyond the average juror's understanding. <u>See</u> <u>State v. Kelly</u>, 97 N.J. 178, 209 (1984). For this reason, courts must exclude an expert's testimony that constitutes  nothing more than a "net opinion" – an opinion that is based merely on unfounded speculation and unquantified possibilities. <u>See</u> <u>Dawson</u>, 289 N.J. Super. at 309. This rule is merely a restatement of the well-settled principle that an expert's bare conclusions, unsupported by factual evidence, are inadmissable. <u>See</u> <u>Buckelew</u>, 87 N.J. at 12. The net opinion rule requires the expert

to give the "why and wherefore" of the opinion, rather than a mere conclusion. See Rosenberg v. Tavorath, M.D., 352 N.J. Super 385 (App. Div. 2002). Expert testimony, therefore, is unpermitted if it appears that the witness is unable to articulate a reasonably accurate conclusion, as distinguished from a mere guess or conjecture. See Vuocolo v. Diamond Shemrock Chem. Co., 240 N.J. Super. 289, 299 (App. Div. 1990). An expert who offers an opinion without providing specific underlying reasons for the conclusions "ceases to be an aid to the trier of fact and becomes nothing more than an additional juror." Jimenez, 286 N.J. Super. at 540.

Nolte's opinions regarding the manufacturing defect are based upon pure conjecture and hypothesis. Specifically, Nolte did not test the sensors that he claims were defective because they were discarded. Nolte failed to request an exemplar sensor and inspect other DK-12s from the same installation at the hospital in order to determine if there was a manufacturing defect with the lot. Nolte did not determine which specific component failed within the DK-12, but failed temporarily then fixing itself and working again without incident for another fourteen months. Finally, Nolte failed to conduct any independent research. Conversely, Nolte testified to his total lack of knowledge regarding the actual manufacturing defect. Moreover, Nolte concedes that he is unqualified to offer a professional opinion regarding the electrical components' capability of malfunctioning, but rather would require an electrical engineer to decipher this information.

### 2. *Res Ipsa Loquitur*

While Plaintiff is entitled to an inference of product defect as a result of Besam's spoliation of evidence, Plaintiff is not entitled to a *res ipsa loquitur* inference against Defendants, nor is she entitled to receive an inference of product defect under the "indeterminate product defect test."

Where no direct evidence exists regarding Defendants' negligence, the doctrine of *res ipsa loquitur* allows, *via* circumstantial evidence, an inference that the harm sustained by the plaintiff was caused by the defendant's negligence. In Myrlak v. Port Auth., however, the New Jersey Supreme Court specifically stated that the doctrine of *res ipsa loquitur* is inapplicable to a product defect case brought by a plaintiff against a manufacturer. See 157 N.J. 84, 95 (N.J. 1999). Instead, the Court determined that a plaintiff may enjoy a similar inference only when the requirements set forth in the Restatement (Third) of Torts § 3 (1998) are met:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
> (A) was of a kind that ordinarily occurs as a result of a product defect; AND
> (B) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Restatement (Third) of Torts § 3 (1998); Myrlak, 157 N.J. at 95; Brown v. Raquet Club of Bricktown, 95 N.J. 280, 288-92 (1984). Here, Plaintiff asserts that the OR entry door nearest her suddenly closed, striking her hip. Common experience does not provide that this alleged incident would not have occurred in the absence of a product defect with the DK-12 detection sensors mounted on the doors. Specifically, Nolte conceded that when the sensors are properly operating and the door has entered its closing cycle, the DK-12s are not in detection and a person entering the door's swing path could be hit by the door. Because this is how the DK-12s normally operate, a claim for being hit by the door does not constitute an event that would ordinarily suggest a defect in the door sensors.

3.     Inference of Product Defect Due to Negligent Spoliation

Plaintiff is entitled to an inference of product defect because Besam's act of destroying the DK-12 sensors arguably constituted negligent spoliation of evidence material to Plaintiff's case.

"Spoliation, as its name implies, is an act that spoils, impairs or taints the value or usefulness of a thing." Rosenblit v. Zimmerman, 166 N.J. 391, 400 (2001) (citing Black's Law Dictionary 1409 (7th ed. 1999)).   "Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition." Hirsch v. Gen. Motors Corp., 266 N.J. Super. 222, 234 (Law Div. 1993).  While New Jersey does not recognize the independent tort of spoliation of evidence, when a defendant spoliates evidence, there has been a failure to comply with civil discovery.  See id. at 256; see also Nearney v. Garden State Hosp., 229 N.J. Super. 37, 39-40 (App. Div. 1988).  The elements of spoliation include:

> (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of the defendant that litigation exists or is probable; (3) willful or, possibly, negligent destruction of evidence by the defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's acts.

Viviano v. CBS, Inc., 251 N.J. Super. 113, 126 (App. Div. 1991) (citing County of Solano v. Delancy, 215 Cal. Rptr. 721, 729 (Cal. App. 1988)).  Here, Besam knew of the litigation that would likely arise as a result of Plaintiff's injury, having already been served with the Plaintiff's Complaint. Besam, nonetheless, destroyed evidence by discarding the sensors in question.  The destruction of the evidence disrupted Plaintiff's case by preventing her from being able to inspect the specific

14

sensors.

The first and second element of spoliation, that there be pending litigation involving Plaintiff and that Besam knew or should have known of that litigation, has been met.  Plaintiff claims that she filed an incident report on March 25, 2004.  Additionally, Plaintiff claims that she served Besam with the Complaint on May 6, 2005, more than a week before Besam's repairman, Diehl, while acting within the scope of his employment, was dispatched to repair the malfunctioning OR doors. As such, this Court finds that the knowledge of the pending litigation may have been imputed to Besam's repairman, Diehl, when the sensors were destroyed.  This Court finds that there was pending litigation and that Besam had knowledge that such litigation was pending at the time it destroyed or discarded the sensors.

The third element of spoliation, that Besam's destruction of the sensors when it had a duty to preserve such sensors arguably constituted negligence, has also been met.  The existence of a duty to preserve evidence is a question of law to be determined by the court. See Hirsch, 266 N.J. Super. at 249.  Here, Besam argues that it had no duty to preserve any evidence from any hospital door. Besam argues that it had forty-seven doors at the hospital and, thus, could not be expected to know which door was defective upon receipt of Plaintiff's Complaint. Besam, however, had a duty not to dispose of any door equipment.  First, and most importantly, knowing there was litigation pending involving *a* door at BMC, Besam had an obligation not to dispose of *any* door equipment, specifically faulty safety sensors – the possible cause of a pedestrian injury – until Besam identified the door that injured Plaintiff. Second, BMC's call on May 16, 2005 indicating that the OR entry door was defective due to faulty safety sensors arguably gave Besam sufficient notice regarding which door was the problem. Finally, per Besam, there were no other doors at BMC that were alleged to be faulty, leaving the OR entry doors as the doors that could have been involved in the

injury.  As such, this Court finds that Besam had a duty to preserve the sensors that its repairman discarded.

Finally, the fourth and fifth elements of spoliation, that the destruction of the sensors were a disruption to Plaintiff's case and that Plaintiff has sustained damages as a result, have also been satisfied.  In order to prevail on a strict products liability theory, it is necessary to demonstrate that a product was defective.  See Scanlon v. Gen. Motors Corp., Chevrolet Motor Div., 65 N.J. 582, 590 (N.J. 1974).  A defendant who destroys evidence interferes with a plaintiff's ability to prosecute a lawsuit and right to discovery. See Hirsch, 266 N.J. Super at 245. In a products liability action, the burden of production is generally on the plaintiff.  Here, without having the sensors to inspect, Plaintiff will be unable to demonstrate that the product was defective and carry her burden. For these reasons, Besam's acts disrupted Plaintiff's case and may have proximately caused damages to Plaintiff.

4.    Sanctions for Besam's Spoliation

This Court finds that Besam failed to comply with the civil discovery process and should, therefore, be sanctioned pursuant to FED. R. CIV. P. 37(b)(2).  "[W]hen a defendant negligently spoliates evidence, there has been a failure to comply with civil discovery."  Hirsch, 266 N.J. Super. at 234.  The key considerations in determining the appropriateness of spoliation sanctions are:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid, 13 F.3d at 79.  "'Since dismissal with prejudice is the ultimate sanction, it will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-

16

delinquent party.'" <u>Hirsch</u>, 266 N.J. Super. at 261 (quoting <u>Johnson v. Mountainside Hosp.,</u>

<u>Respiratory Disease Assocs.</u>, 199 N.J. Super. 114, 119 (App. Div. 1985)).    A district court "has

inherent authority to enter sanctions for discovery abuses . . . . This inherent power has been

reinforced by FED. R. CIV. P. 37(b)(2)." <u>Id.</u> at 257.

      Besam's actions in destroying the sensors were an abuse of the discovery process, thereby

prejudicing Plaintiff's case.  While this arguably negligent act was a disruption to Plaintiff's case,

this Court does not find a significant enough prejudice to merit a suppression of defenses.  Moreover,

Plaintiff did not attempt to inspect other sensors at BMC or a similar sensor to determine if other

sensors in the same lot were also defective.  As such, this Court finds that the prejudice suffered by

Plaintiff should be remedied by an inference of product defect.  This creates a genuine issue of

material fact regarding the possible defective nature of the sensors in question, thereby precluding

summary judgment.

      This result is similar to the result in <u>Hirsch</u>, a case in which an automobile insurer, State

Farm Mutual Automobile Insurance Company ("State Farm"), a subrogee for insureds, brought

an action against a vehicle manufacturer ("GM") and dealer ("Warnock") arising from a fire that

severely damaged an automobile. <u>See id.</u> at 228-29. In July of 1990, the automobile's rear brakes

were cleaned and adjusted and the air conditioning hose and front brakes were replaced. <u>See id.</u>

at 230. In August of 1990, the vehicle caught fire while parked in the plaintiff's driveway. <u>See id.</u>

The fire department incident report stated that the fire originated in the engine compartment,

although the ignition factor was undetermined. <u>See id.</u> State Farm declared the automobile a

"total loss" and settled with the plaintiffs. <u>See id.</u> at 230-31. In September of 1990, a salvage

company took possession of the car. <u>See id.</u>

In October of 1990, State Farm retained Vallas Associates ("Vallas") to inspect the car. See id. at 231. Vallas concluded that a ruptured brake fluid line caused the fire in the vehicle's engine compartment. See id. The salvage company received title to the vehicle in November of 1990. The car was then sold and its whereabouts were unknown. See id. State Farm contacted GM and Warnock in September of 1990 and reported the incident. See id. There was no further contact between the plaintiffs and defendants until April of 1991 when State Farm sent a letter to the defendants seeking reimbursement for the money it paid to its insureds. See id. In October of 1991, plaintiffs filed suit. The defendants did not have an opportunity to inspect the automobile before it was lost or destroyed. Subsequently, a motion to dismiss the plaintiffs' claim was filed. See id. at 233.

The Hirsch Court concluded that a duty to preserve evidence, independent from a court order, arises where there is: "(1) pending or probable litigation involving the defendants; (2) knowledge by the plaintiff of the existence or likelihood of litigation; (3) foreseeability of harm to the defendants, or in other words, discarding the evidence would be prejudicial to defendants; and (4) evidence relevant to the litigation." 266 N.J. Super. at 250. The Court found that plaintiffs had a duty to preserve the automobile and that they breached that duty, resulting in an interference with the discovery process. See id. at 251.

This Court agrees with the Hirsch rationale. Applying Hirsch to the facts in this case, Besam had a duty to preserve the sensors. Additionally, it was foreseeable that disposal of the sensors would be prejudicial to Plaintiffs. As similarly noted by the Hirsch Court, Plaintiff's expert was denied the opportunity to inspect the sensors and determine the validity and viability of the reports prepared by Plaintiff's expert. See id. Finally, as in Hirsch, the sensors are "central, and thus relevant and material, to this litigation. It is the best evidence to . . . ensure that the

18

results will be accurate." Id. at 251. Accordingly, as in Hirsch, Besam had a duty to preserve the sensors, but they breached that duty by not preserving them for Plaintiff's inspection, thereby substantially and irreparably interfering with the discovery process. See id.; but see Allis-Chalmers Corp. Prod. Liab. Trust v. Liberty Mut. Ins. Co., 305 N.J. Super. 550 (App. Div. 1997).

Besam's claim that there has not been a showing that it owed a duty to preserve the sensors, as it did not own or control the sensors is without merit. Also, as noted in Hirsch, "[t]he spoliator's level of intent, whether negligent or intentional, does not affect the spoliator's liability. Rather, it is a factor to be considered when determining the appropriate remedy for the spoliation." 266 N.J. Super. at 256. Furthermore, the spoliating party's state of mind is not essential to determine the proper sanction to be imposed. See id. at 265 (quoting Johnson, 199 N.J. Super. at 119). Besam destroyed the DK-12 sensors and, as such, Plaintiff was prejudiced by the loss of her ability to inspect the sensors.  As such, Plaintiff is entitled to an inference of product defect to erase the prejudice and make the Plaintiff whole.  Therefore, a limited instruction will be given to the trier of fact at the appropriate time.

This Court is fully aware that, after a cursory reading, this Opinion may appear inconsistent with this Court's Opinion with respect to BEA and Halma. It is, therefore, important to recall the wide discretion afforded to a court in determining sanctions for a spoliation charge. While a court can do as much as dismiss a case with prejudice as a spoliation sanction, "'[s]ince dismissal with prejudice is the ultimate sanction, it will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party.'" Hirsch, 266 N.J. Super. at 261 (quoting Johnson v. Mountainside Hosp., Respiratory Disease Assocs., 199 N.J. Super. 114, 119 (App. Div. 1985)).   A district court "has inherent authority to enter sanctions for discovery abuses . . . . This inherent power has been reinforced by FED. R. CIV. P.

37(b)(2)." Id. at 257. It is important in this case to afford Plaintiff the appropriate spoliation inference with respect to Besam, while simultaneously freeing BEA and Halma from any liability caused by Besam. Therefore, this Court deems it prudent to grant summary judgment in favor of BEA and Halma, but not in favor of Besam.

**IV.   CONCLUSION**

For the reasons stated, it is the finding of this Court that Plaintiff's motion for reconsideration is **granted** in part and **denied** in part; and Besam's motion for partial summary judgment is **denied**. An appropriate Order accompanies this Opinion.

 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:          April    10    , 2008
Orig.:         Clerk
cc:            All Counsel of Record
               Hon. Mark Falk, U.S.M.J.
               File