NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MARY CURTIS, | : | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | : | **OPINION** |
| v. | : | Civil Action No. 05-CV-2807(DMC) |
| BESAM GROUP, BESAM AUTOMATED ENTRANCE SYSTEMS, INC., BESAM USA, B.E.A. INC., THE HALMA GROUP, INC., ABC CORP. 1-20 (fictitious entities), DEF CORP. 1-10 (fictitious entities), JOHN AND JANE DOES 1-30, | : | |
| Defendants. | : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion for summary judgment by B.E.A., Inc. ("BEA") and the Halma Group, Inc. ("Halma," and collectively, "Defendants"); and motion for reconsideration by Plaintiff Mary Curtis ("Plaintiff"). After carefully considering the submissions of the parties and having oral argument on December 19, 2007, and based upon the following, it is the finding of this Court that Plaintiff's motion for reconsideration is **granted** in part and **denied** in part; and Defendants' motion for summary judgment is **granted**.

I.      **BACKGROUND**[1]

Plaintiff was employed as an emergency room ("ER") technician at Bayonne Medical Center ("BMC"). Plaintiff alleges that on March 25, 2004, she was pushing a stretcher and aligning it to enter the Intensive Care Unit ("ICU") when she swung her end of the stretcher into the Operating Room ("OR") entry door alcove immediately across the hall from the ICU doors. Registered Nurse Lori Lopez was allegedly guiding the front of the stretcher. When Plaintiff entered the OR entry door alcove, her right hip was closest to the door on her right. Plaintiff claims that she was there approximately three to five seconds from the time she entered the OR entry alcove when the door closest to her right hip slammed into her hip (the "Accident"). Plaintiff claims that she was standing within one to two feet from the OR entry door alcove. As a result of the alleged incident, Plaintiff sustained back injuries and eventually underwent back surgery.[2] Plaintiff was on "medical leave" from her job at BMC for one year and she returned to work on or about March 26, 2005.

---

[1] The facts set-forth in this Opinion are taken from the Parties' FED. R. CIV. P. 56.1 statements in their respective moving papers. The facts reflect that "[i]n determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

[2] While the Court accepts Plaintiff's testimony as true for purposes of this motion, it should be noted for the record that Lopez, the independent witness to the incident, stated in her deposition that she did not recollect Plaintiff being hit by the OR doors. Lopez only recalled Plaintiff saying that she was hit at some point, but Lopez is unclear whether it was immediately after the incident or later when they returned to the ER. Lopez recalls continuing on to wheel the stretcher and patient into the ICU. Lopez does not recall any jarring, noise or exclamation by Plaintiff or noise or awkward action by the OR doors. Lopez recalls that Plaintiff brought the stretcher back into the ER after they transported the patient to the ICU.

The Accident allegedly occurred on March 25, 2004. Notwithstanding Plaintiff's testimony that, in March 2005, she saw the door almost close on a patient, the automatic door system and the BEA sensors continued to operate without repair or service until May 17, 2005. Thomas Martiak, a Supervisor at BMC, stated in his deposition that he was never called to the scene to examine any other doors on any other occasion. Plaintiff claims that she completed an incident report and noted a conversation with Martiak regarding the doors acting as if they had no sensors. Martiak, however, does not recall the conversation, nor does he recall telling anyone that there should be a safety device on the OR entry doors.

Plaintiff claims that there was another incident days after she returned to work on March 27, 2005, wherein the OR entry doors closed on the stretcher on which she was moving. Plaintiff claims that Registered Nurse Ellen Visone witnessed the incident on March 27, 2005. Although Visone recalls the incident, she disputes whether the OR entry doors closed on the stretcher.

Besam designed, installed, serviced and maintained the OR automatic entry door system. On or about May 17, 2005, Ryan Diehl, a Besam technician, was dispatched to BMC because the OR entry doors failed to close. Diehl determined that one of the DK-12[3] presence sensors was faulty, preventing it from detecting if anything was in the door's swing path. Diehl, however, never read the DK-12 manual and does not know specifically how DK-12 sensors operate. Diehl admitted that, on the date he replaced the DK-12 sensors, he was unaware whether there was an easier way to correct the problem with the sensors other than removing them. Diehl did not

---

[3] DK-12s are presence sensors, such that when they detect something in the swing path of the door, they prevent the door from opening if the door is closed and will not allow the door to close if open.

attempt to fix the sensor because he "had no way of knowing how to fix it." Diehl did not know how to determine what, if anything, was wrong with either DK-12, so he replaced both DK-12s.

Plaintiff's expert, Wayne F. Nolte, Ph.D., P.E., discussed the OR doors in his Engineering Report.[4] The OR entry doors were installed in 1998 as part of a BMC remodel project. The OR automatic entry door system included two Besam Swingmaster 455a operators, two DK-12 presence sensors, a LO-21[5] lock-out relay and two push-plates. BEA and Halma manufacture, *inter alia*, automatic door safety sensors, including DK-12s and LO-21s. BEA and Halma, however, were not involved in the design, installation, service or maintenance of the OR automatic entry door system. The OR entry doors also operate manually by using a handle to pull open, as a normal, non-automated door. The OR entry doors are activated to open under power by pressing a push plate. Activating a power door by way of a push plate is known as a "knowing act" activation. Plaintiff was never in custody, control or possession of the sensors, but nonetheless no party took any action to retain the sensors. Instead, Besam discarded the sensors. Therefore, Nolte was unable to test the sensors in question and apparently chose not to test or examine similar sensors.

The OR entry door push plates are located in the BMC hallway and inside the OR doors so that they can be activated from either side. The OR entry doors do not close under power, but

---

[4] All of the technical information concerning the doors and sensors discussed in this Opinion are found in Wayne F. Nolte, Ph.D., P.E.'s Engineering Report, dated April 19, 2006.

[5] The LO-21 is a lock-out device, which allows the doors to be reactivated before completion of the closing cycle when the push plate is activated. It merely allows the doors to be reactivated before completion of the closing cycle. Aug. 15, 2006 deposition of BEA's Jeff Dunham at 52:6-53:12.

4

rather against a spring. The DK-12 sensors have a number of different settings options, such as relay hold time and sensitivity, which must be set upon installation and were set by Besam in this case. Nolte did not determine how many different settings there are on the DK-12.  Although it is critical that the DK-12 in question was unavailable for Nolte's inspection, he admitted that he did not make any inquiry or otherwise attempt to determine the allegedly defective sensor's lot number, nor did he attempt to compare other DK-12s within the hospital to determine if there were manufacturing defects. Nolte failed to conduct this investigation despite his concession that, if a product has a manufacturing defect, an inquiry should be made regarding other products from the same lot to determine if they share the same manufacturing defect.

## II.     STANDARD OF REVIEW

   A.     L. CIV. R. Motion for Reconsideration

Motions for reconsideration are governed by L. CIV. R. 7.1(i).  See United States v. Compaction Sys. Corp., 88 F. Supp. 2d 339, 345 (D.N.J. 1999).  A motion pursuant to L. CIV. R. 7.1(i) may be granted only if (1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. See Database Am., Inc. v. Bellsouth Adver. & Pub. Corp., 825 F. Supp. 1216, 1220 (D.N.J. 1993).  Such relief is "an extraordinary remedy" that is to be granted "very sparingly." See NL Indus. Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996). Reconsideration is inappropriate where the motion merely raises a party's disagreement with the Court's decision or seeks to rehash arguments already raised and rejected. See Russell v. Levi, 2006 WL 2355476 *1-2 (D.N.J. Aug. 15, 2006); Oritani S&L v. Fidelity &

Deposit, 744 F. Supp. 1311, 1314 (D.N.J. 1990); Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F. Supp. 159, 163 (D.N.J. 1988).

      B.      Fed. R. Civ. P. 56 Summary Judgment

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. See id. "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). "In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

### III. DISCUSSION

#### A. Motion for Reconsideration

This Court finds that Plaintiff has failed to meet its burden in demonstrating that significant facts exist warranting reconsideration of this case as it relates to BEA and Halma. As such, while this Court grants Plaintiff's motion for reconsideration as it relates to Besam, reconsideration of this matter relating to BEA and Halma is denied.

#### B. Summary Judgment

Plaintiff's First Count alleges product defects, which are unsupported by admissible opinion testimony from her own expert and there are no credible and genuine independent facts to support those claims. Similarly, Plaintiff's Second Count alleges negligence against BEA and Halma, which lacks legal basis because BEA and Halma only manufacture the sensors and the claims are subsumed by the New Jersey Product Liability Act. See N.J.S.A. 2A:58C-2. Finally, Plaintiff is not legally entitled to an indeterminate product defect inference. Without expert testimony and an inference of indeterminate product defect, Plaintiff cannot sustain her claims against BEA and Halma's summary judgment challenge. Thus, BEA and Halma's motion for summary judgment is granted.

Plaintiff's First Count, which alleges product defect claims against BEA and Halma, must be dismissed on summary judgment. Plaintiff claims that BEA and Halma manufactured a defective product under two theories of liability: (1) BEA and Halma defectively manufactured the sensors; and (2) BEA and Halma failed to warn foreseeable users that their sensor has an alleged six-year "shelf-life," which Plaintiff claims is a dangerous condition. BEA and Halma

7

assert that Plaintiff has no credible factual or expert testimony or opinion supporting her theories against BEA and Halma and Plaintiff is not entitled to an inference to fill-in the gaps in the proofs.

Plaintiff cannot prove manufacturing defects as a matter of law. To succeed under the New Jersey Product Liability Act on a manufacturing defect claim, a plaintiff must prove that the product was not manufactured according to its design specifications. A manufacturing defect is a "deviation from the design specification, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae." See Myrlak v. Port Auth., 157 N.J. 84, 97 (1999). New Jersey has also adopted the Restatement (Third) of Torts: Product Liability, which defines a manufacturing defect as a departure from the product's intended design, despite the manufacturer's use of all possible care in preparing and marketing the product. Plaintiff must show that the particular DK-12 sensors in question "came off of the production line in a substandard condition." See Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 576 (App. Div. 1986). Here, Plaintiff has failed to demonstrate that the particular lot of DK-12 sensors was flawed in production.

Plaintiff cannot sustain its "failure to warn" claims without admissible expert testimony. Plaintiff claims that the sensors had a six-year "shelf-life" because one of the sensors allegedly failed after six years when the OR entry doors allegedly hit Plaintiff. Plaintiff alleges that this "shelf-life" is a dangerous condition and that BEA and Halma had a duty to warn foreseeable users of the condition. Plaintiff alleges that BEA and Halma's failure to warn her of an alleged "shelf-life" was the proximate cause of her accident.

A New Jersey plaintiff bringing a claim for failure to warn has the burden of proving that the manufacturer did not warn of the risks attendant to the product and that the failure to warn was a proximate cause of plaintiff's injuries. See Sharpe v. Bestop, Inc., 713 A.2d 1079, 1083 (N.J. Super. Ct. App. Div. 1998). Here, Plaintiff fails to demonstrate that the DK-12 sensors had a "defective and dangerous condition" that represents a risk attendant to the product. For example, Plaintiff failed to address the fact that, after the accident, the sensors operated properly without incident until May 2005 – some fourteen months after the initial incident. In fact, Plaintiff's expert concedes that the Besam technician who came to service the doors found that only one of the sensor's LED lights was out. He also concedes that the technician had no training in servicing the sensors, no knowledge regarding how the sensor worked, no idea whether the sensor was actually broken or had a defect and could not even remember which sensor's light was out. The technician removed both sensors and replaced them because he was unable to determine if there was a problem with them. Furthermore, Plaintiff fails to offer any evidence that an DK-12's "shelf-life" is six years. Therefore, Plaintiff fails to show that there was a dangerous condition. Plaintiff also fails to propose a warning that would adequately apprise users of the inherent risk associated with automatic doors, besides the one already in place on the date of the accident. Finally, Plaintiff fails to address the fact that "no product is intended to last indefinitely and many products require care and maintenance to perform at the same level as they did new." H.T. Rose Enters., Inc. v. Henney Penny Corp., 317 N.J. Super. 490 (App. Div. 1998). Plaintiff fails to prove a "shelf-life" defect in the DK-12, propose a warning which would allegedly have apprised her of the risk or demonstrate that any failure to warn was the proximate

9

cause of her injury, so her "failure to warn" claims against BEA and Halma fail as a matter of law.

Summary judgment must be granted with respect to all of Plaintiff's claims against BEA and Halma. A party's case must be dismissed on summary judgment if the party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party bears the ultimate burden of proof at trial. See Celotex, 477 U.S. at 323. Further, the mere existence of some alleged factual dispute between the parties is an insufficient basis upon which to deny a motion for summary judgment. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). There must remain a genuine issue of material fact. The Supreme Court of the United States determined that a fact is "material" if it will affect the outcome of a lawsuit under the applicable law and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact-finder could return a verdict for a nonmoving party. See id. Here, because Plaintiff's product defect claims against BEA and Halma rely upon her expert's purported opinions and those opinions are mere hypotheses which are inadmissible as a matter of law, Plaintiff cannot sustain her claims. As Plaintiff's expert, Nolte, concedes, he does not know what the alleged manufacturing defect is, or even whether one exists and he concedes that he does not know if DK-12s have a six-year "shelf-life."

Despite Nolte's assertion that it might have been one of the myriad of electrical components within the DK-12 sensors that failed, he conceded that the sensors would not fix themselves such that the door would operate again for fourteen months, but rather the component would be in need of repair. Nolte admitted that if one product in a lot has a manufacturing defect,

10

one should examine the other products in the lot to determine if they share the same defect. Nolte conceded further that he failed to inquire or otherwise attempt to determine what the lot number of the allegedly defective sensor was or to compare it to other DK-12 sensors within the hospital to determine if they also contained manufacturing defects.

Nolte testified that BEA and Halma's DK-12 sensors have a six-year "shelf-life" and this is a dangerous condition and a defect against which BEA and Halma failed to warn. Nolte's opinions, however, are again rife with speculation and unquantified possibilities. Specifically, Nolte testified at deposition that he does not know if DK-12s have a six year "shelf-life." Nolte concedes that he is unaware of any other DK-12s that have failed after six years and he bases his opinion that the DK-12s have such a "shelf-life" on the single sensor that controlled the door that allegedly struck Plaintiff.

Nolte concedes that he did not ask Plaintiff's counsel to request any manufacturing testing information for the sensors' "shelf-life" or that such information would be essential to his analysis and opinion in this case. Nolte failed to read any literature regarding a DK-12's purported "shelf-life." Nolte concedes that he did not do any research to determine when DK-12s have failed in the past. He did not search any of his periodicals or any other expert websites to determine whether automatic door sensors have "shelf-lives." In fact, Nolte concedes that his opinion regarding the DK-12 sensors' "shelf-life" is based solely upon his examination – or lack thereof – in this case.

11

C.   Analysis Under Daubert

Under Daubert v. Merrell Dow Pharms. Inc., Nolte's opinions are scientifically unreliable and, therefore, must be barred. See 509 U.S. 579 (1993). The decision to admit expert testimony rests within the sound discretion of the trial judge. See Muise v. G.P.U., Inc., 851 A.2d 799, 826 (N.J. Super. Ct. App. Div. 2004). The trial judge acts as a gatekeeper to insure that all expert testimony is both relevant and reliable. See Daubert, 509 U.S. at 589. FED. R. EVID. 702, which governs the admissibility of expert testimony in Federal Court, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The admissibility decision focuses on the expert's methodology, reasoning, foundation of documents and data. Judgments regarding credibility and weight arise only after admissability has been determined. See Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997). In Daubert, the Supreme Court of the United States articulated factors for courts to consider in determining whether to admit expert testimony: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship between the technique to methods which have been established to be reliable; (7) the testifying expert witness's qualifications; and (8) the nonjudicial uses to which the method has been utilized. See In re Paoli R.R. Yard Pcb Litig., 35

F.3d 717, 742 (3d Cir. 1994). Daubert applies not only to scientific knowledge, but also testimony based on technical and other specialized knowledge. See Kumbo Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

In this case, Nolte failed to base his opinion on salient facts and data because they are not the result of applying reliable engineering principles and methods. Nolte arguably sets-out testable hypotheses regarding the manufacturing defect, which he claims may have resulted from one of the sensor's electronic components failing. Similarly, he opines that DK-12 sensors have a six-year "shelf-life." Nolte similarly failed to provide the appropriate methodology or sound engineering basis for his conclusions. Although the DK-12 in question was unavailable for inspection, Nolte admittedly failed to make any inquiry or otherwise attempt to determine the lot number of the allegedly defective sensor to compare it to other DK-12 sensors within the hospital to see if they also contained manufacturing defects. The Court recognizes that the DK-12 sensor in question was unavailable for Nolte's inspection, but Nolte failed to investigate the lot despite his concession that, if a product has a manufacturing defect, an inquiry should be made regarding other products from the same lot to determine if they share the same manufacturing defect. Thus, because Nolte failed to use any methodology, testable hypothesis or standards upon which to base his findings, both Daubert and FED. R. EVID. 702 preclude their admission. Nolte's opinions provide no assistance to a jury, so they are inadmissable under Daubert and Plaintiff cannot rely upon them in support of her claim against BEA and Halma.

13

D.	Net Opinion

Nolte's testimony is inadmissable as a matter of law because it is net opinion and cannot withstand a Daubert analysis. On April 19, 2006 and September 21, 2006, Nolte issued written expert reports in this case. Nolte was deposed on May 17, 2007, at which time he opined that BEA and Halma's DK-12 sensors were defective and were a cause of Plaintiff's injuries because BEA and Halma's DK-12 sensors contained manufacturing defects and had a dangerous or defective condition, namely a six-year "shelf-life" of which BEA and Halma failed to warn. Nolte's opinions, however, are net opinions and are inadmissable under Daubert.

Nolte's opinions are based on speculation, possibilities or contingencies instead of fact and analysis and are, thus, inadmissable net opinions. It is well-settled among New Jersey courts that, in order for an expert opinion to be admissible at trial, the opinion must be based upon factual evidence and not pure speculation, possibilities or contingencies. See Buckelew v. Grossbard, 87 N.J. 512 (1981); Dawson v. Bunker Hill Plaza Assocs., 289 N.J. Super. 309 (App. Div. 1996); Jiminez v. GNOC Corp., 286 N.J. Super. 533 (App. Div. 1996). Expert opinion testimony is intended to assist the trier-of-fact in making factual determinations in areas that are normally outside the sphere of general common knowledge and beyond the average juror's understanding. See State v. Kelly, 97 N.J. 178, 209 (1984). For this reason, courts must exclude an expert's testimony that constitutes nothing more than a "net opinion" – an opinion that is based merely on unfounded speculation and unquantified possibilities. See Dawson, 289 N.J. Super. at 309. This rule is merely a restatement of the well-settled principle that an expert's bare conclusions, unsupported by factual evidence, are inadmissible. See Buckelew, 87 N.J. at 12. The net opinion rule requires the expert

14

to give the "why and wherefore" of the opinion, rather than a mere conclusion. See Rosenberg v. Tavorath, M.D., 352 N.J. Super 385 (App. Div. 2002). Expert testimony, therefore, is unpermitted if it appears that the witness is unable to articulate a reasonably accurate conclusion, as distinguished from a mere guess or conjecture. See Vuocolo v. Diamond Shemrock Chem. Co., 240 N.J. Super. 289, 299 (App. Div. 1990). An expert who offers an opinion without providing specific underlying reasons for the conclusions "ceases to be an aid to the trier of fact and becomes nothing more than an additional juror." Jimenez, 286 N.J. Super. at 540.

Nolte's opinions regarding the manufacturing defect are based upon pure conjecture and hypothesis. Specifically, Nolte did not test the sensors that he claims were defective and were discarded due to either Plaintiff or Besam's failures to preserve the sensors. Nolte failed to request an exemplar sensor and inspect other DK-12s from the same installation at the hospital to determine if there was a manufacturing problem with the lot. Nolte did not determine which specific component failed within the DK-12, but failed temporarily then fixing itself and working again without incident for another fourteen months. Finally, Nolte failed to conduct any independent research. Conversely, Nolte testified to his total lack of knowledge regarding the actual manufacturing defect. Moreover, Nolte concedes that he is unqualified to offer a professional opinion regarding the electrical components' capability of malfunctioning, but rather would require an electrical engineer to decipher this information.

    E.    *Res Ipsa Loquitur*

Plaintiff is not entitled to a *res ipsa loquitur* inference against BEA and Halma, nor is she entitled to receive an inference of product defect under the "indeterminate product defect test." If no direct evidence exists regarding BEA and Halma's negligence, the doctrine of *res ipsa loquitur* allows, *via* circumstantial evidence, an inference that the harm sustained by the plaintiff was caused

by the defendant's negligence. In Myrlak v. Port Auth., however, the New Jersey Supreme Court specifically stated that the doctrine of *res ipsa loquitur* is inapplicable to a product defect case brought by a plaintiff against a manufacturer. See 157 N.J. 84, 95 (N.J. 1999). Instead, the Court determined that a plaintiff may enjoy a similar inference only when the requirements set forth in the Restatement (Third) of Torts § 3 (1998) are satisfied:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
> (A) was of a kind that ordinarily occurs as a result of a product defect; AND
> (B) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Restatement (Third) of Torts § 3 (1998); Myrlak, 157 N.J. at 95; Brown v. Raquet Club of Bricktown, 95 N.J. 280, 288-92 (1984). Here, Plaintiff asserts that the OR entry door closest to her suddenly closed, thereby striking her hip. Common experience does not provide that this alleged incident would not have occurred in the absence of a product defect with the detection sensors mounted on the doors, namely the DK-12s. Specifically, Nolte conceded that, when the sensors are properly operating and the door has entered its closing cycle, the DK-12s are not in detection and a person entering the door's swing path could be hit by the door. Because this is how the DK-12s normally operate, a claim for being hit by the door does not constitute an event that would ordinarily suggest a defect in the door sensors.

    F.    Spoliation

"Spoliation, as its name implies, is an act that spoils, impairs or taints the value or usefulness of a thing." Rosenblit v. Zimmerman, 166 N.J. 391, 400 (2001) (citing Black's Law Dictionary 1409 (7th ed. 1999)). "Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and

16

disposition." Hirsch v. Gen. Motors Corp., 266 N.J. Super. 222, 234 (Law Div. 1993). While New Jersey does not recognize the independent tort of spoliation of evidence, when a defendant spoliates evidence, there has been a failure to comply with civil discovery. See id. at 256; see also Nearney v. Garden State Hosp., 229 N.J. Super. 37, 39-40 (App. Div. 1988). The elements required for a spoliation charge are:

> (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of the defendant that litigation exists or is probable; (3) willful or, possibly, negligent destruction of evidence by the defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's acts.

Viviano v. CBS, Inc., 251 N.J. Super. 113, 126 (App. Div. 1991) (citing County of Solano v. Delancy, 215 Cal. Rptr. 721, 729 (Cal. App. 1988)). Here, unlike with Besam,[6] BEA and Halma did not have a duty to preserve the sensors. Accordingly, Plaintiff cannot demonstrate that BEA and Halma negligently spoliated evidence, which would give rise, as it did in the Besam decision, to an inference of product defect. This Court finds no reason to sanction BEA and Halma for Besam's interference with civil discovery.

**IV.   CONCLUSION**

For the reasons stated, it is the finding of this Court that Plaintiff's motion for reconsideration is **granted** in part and **denied** in part; and Defendants' motion for summary judgment is **granted**. An appropriate Order accompanies this Opinion.

  S/ Dennis M. Cavanaugh
  Dennis M. Cavanaugh, U.S.D.J.

Date:         April   10  , 2008
Orig.:        Clerk
cc:           All Counsel of Record

---

[6] See opinion filed this day with respect to other named defendants in this case.

Hon. Mark Falk, U.S.M.J.
File